**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Department of Justice, Antitrust Division<br>450 Fifth Street NW, Suite 4000<br>Washington, DC 20530,<br><br>*Plaintiff*,<br><br>v.<br><br>NATIONAL ASSOCIATION OF REALTORS®<br>430 North Michigan Ave.<br>Chicago, IL 60611,<br><br>*Defendant*. | Case No. 1:20-cv-3356 |

**COMPLAINT**

The United States of America brings this civil antitrust action to obtain equitable relief against Defendant National Association of REALTORS®. The United States alleges as follows:

## I.     NATURE OF THE ACTION

1.     Defendant National Association of REALTORS® ("NAR") has adopted a series of rules, policies, and practices governing, among other things, the publication and marketing of real estate, real estate broker commissions, as well as real estate broker access to lockboxes, that have been widely adopted by NAR's members resulting in a lessening of competition among real estate brokers to the detriment of American home buyers. These NAR rules, policies, and practices include:

1

    (a)    prohibiting NAR-affiliated multiple-listing services ("MLSs") from disclosing to prospective buyers the amount of commission that the buyer broker will earn if the buyer purchases a home listed on the MLS;

    (b)    allowing buyer brokers to misrepresent to buyers that a buyer broker's services are free;

    (c)    enabling buyer brokers to filter MLS listings based on the level of buyer broker commissions offered and to exclude homes with lower commissions from consideration by potential home buyers; and

    (d)    limiting access to the lockboxes that provide licensed brokers with physical access to a home that is for sale to only brokers who are members of a NAR-affiliated MLS.

2. These NAR rules, policies, and practices have been widely adopted and enforced by NAR-affiliated MLSs, and are, therefore, agreements among competing real estate brokers each of which reduce price competition among brokers and lead to lower quality service for American home buyers and sellers. Together, the agreements also have a cumulative anticompetitive effect. The agreements individually and collectively unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and should be enjoined.

3. Accordingly, the United States seeks an order requiring NAR to cease its activities with respect to these rules, policies, and practices and providing additional relief.

## II.    JURISDICTION AND VENUE

4. NAR is engaged in interstate commerce and in activities substantially affecting interstate commerce. NAR transacts business throughout the United States. NAR's membership includes brokers and agents that conduct business across the United States in the local areas in

which each member operates. NAR's rules, policies, and practices govern the conduct of its members in all 50 states, including the conduct of all of NAR's individual member brokers and their affiliated agents and sales associates ("REALTORS®"). The anticompetitive rules, policies, and practices alleged in this Complaint violate the Sherman Act and affect home buyers and sellers located throughout the United States. The Court has subject matter jurisdiction under Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain NAR from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

5. NAR has consented to venue and personal jurisdiction in this District. Venue is also proper in this judicial district under 28 U.S.C. § 1391(b)(1).

### III.   THE DEFENDANT

6. NAR is a trade association organized under the laws of Illinois with its principal place of business in Chicago. It is the leading national trade association of real estate brokers and agents. Among its members are licensed residential real estate brokers, including brokers who provide real estate brokerage services to home sellers ("listing brokers"), home buyers ("buyer brokers"), or both (collectively "residential brokers").

### IV.   INDUSTRY BACKGROUND

7. Among other activities, NAR establishes and enforces rules, policies, and practices, that are adopted by NAR's 1,400+ local associations (also called "Member Boards") and their affiliated MLSs that govern the conduct of NAR's approximately 1.4 million-member REALTORS® who are engaged in residential real estate brokerages across the United States.

8. The real estate brokerage business by its nature tends to be local. Most buyers and sellers prefer to work with a broker who is familiar with local market conditions. As a result,

NAR's member brokers and agents compete with one another in local listing broker and buyer broker service markets to provide real estate brokerage services to home sellers and home buyers.

9. MLSs are joint ventures among competing brokers to facilitate the publishing and sharing of information about homes for sale in a geographic area. The membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area. The geographic coverage of the MLS serving an area normally establishes the geographic market in which competition among brokers occurs, although meaningful competition among brokers may also occur in smaller areas, like a particular area of a city, in which case that smaller area may also be a relevant geographic market.

10. In each area an MLS serves, the MLS will include or "list" the vast majority of homes that are for sale through a residential real estate broker in that area. In most areas, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings. Listing brokers will use the MLS to market sellers' properties to other broker and agent participants in the MLS and, through those other brokers and agents, to potential home buyers. By virtue of nearly industry-wide participation and control over important data, brokers offering MLSs possess and exercise market power in the markets for the provision of real estate brokerage services to home buyers and sellers in local markets throughout the country.

11. NAR, through its Member Boards, controls a substantial number of the MLSs in the United States. NAR promulgates rules, policies, and practices governing the conduct of NAR-affiliated MLSs that are set forth annually in the *Handbook on Multiple Listing Policy* ("Handbook"). Under the terms of the Handbook, affiliated REALTOR® associations and MLSs "must conform their governing documents to the mandatory MLS policies established by [NAR's] Board of Directors to ensure continued status as member boards and to ensure coverage under the

master professional liability insurance program." National Association of REALTORS®, Handbook on Multiple Listing Policy 2020 (32nd ed. 2020), at iii.

12.   NAR and its affiliated REALTOR® associations and MLSs enforce the Handbook's rules, policies, and practices as well as the rules, policies, and practices codified in NAR's Code of Ethics. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association." National Association of REALTORS®, Procedures for Consideration of Alleged Violations of Article IV, Section 2, Bylaws.

## V.   THE UNLAWFUL AGREEMENTS

13.   NAR's Handbook and NAR's Code of Ethics impose certain rules, policies, and practices on NAR-affiliated MLSs that affect competition for the provision of buyer broker services among those participating in a given MLS. In addition, some MLSs employ certain practices that are not directly required by a NAR rule or policy, but that similarly affect competition for the provision of buyer broker services among those participating in an MLS.

14.   These rules, policies, and practices include: prohibiting an MLS from disclosing to prospective buyers the amount of commission that the buyer broker will earn if the buyer purchases a home listed on the MLS ("NAR's Commission Concealment Rules"); allowing buyer brokers to mislead buyers into thinking that buyer broker services are free ("NAR's Free-Service Rule"); enabling buyer brokers to filter MLS listings based on the level of buyer broker commissions offered and to exclude homes with lower commissions from consideration by potential home buyers ("NAR's Commission-Filter Rules and Practices"); and limiting access to lockboxes that

provide licensed brokers physical access to a home that is for sale to only those real estate brokers who are members of a NAR-affiliated MLS ("NAR's Lockbox Policy").

16. NAR's and its affiliated MLSs' adoption and enforcement of these rules, policies, and practices which are described in more detail below, reflect concerted action between horizontal competitors and constitute agreements among competing real estate brokers that reduce price competition among brokers and lead to higher prices and lower quality service for American home buyers and sellers.

### A. NAR's Commission-Concealment Rules

16. NAR's Commission-Concealment Rules recommend that MLSs prohibit disclosing to prospective buyers the total commissions offered to buyer brokers. Such concealment likely leads to higher prices and lower quality for buyer broker services. All or nearly all of NAR-affiliated MLSs have adopted a prohibition on disclosing commissions offered to buyer brokers. This means that while buyer brokers can see the commission that is being offered to them if their home buyer purchases a specific property—a commission that will ultimately be paid through the home purchase price that the home buyer, represented by the buyer broker, pays—MLSs conceal this fee from home buyers.

17. The Commission-Concealment Rules are laid out in several places in NAR's *Handbook*, including Policy Statement 7.58, Policy Statement 7.23, Policy Statement 7.3; Section IV.1.a of the Virtual Office Websites Policy; and Sections 18.3.1 and 19.15 of the Model MLS Rules.

18. NAR's Commission-Concealment Rules relieve buyer brokers from the necessity of competing against each other by offering rebates or offering to accept lower commissions. NAR's Commission-Concealment Rules also make home buyers both less likely and less able to

negotiate a discount or rebate off the offered commission. Finally, NAR's Commission-Concealment Rules encourage and perpetuate the setting of persistently high commission offers by sellers and their listing agents. The result is higher prices for buyer broker services.

19. Buyer brokers may, in fact, steer potential home buyers away from properties with low commission offers by filtering out, failing to show, or denigrating homes listed for sale that offer lower commissions than other properties in the area. When buyers cannot see commission offers, they cannot detect or resist this type of steering. Steering not only results in higher prices for buyer broker services, it also reduces the quality of the services that are rendered to the potential home buyer, making it less likely that the buyer will ultimately be matched with the optimal home choice. Fear of having buyers steered away from a property is also a strong deterrent to sellers who would otherwise offer lower buyer broker commissions, which further contributes to higher prices for buyer broker services.

### B. NAR's Free-Service Rule

20. Because commissions are offered by home sellers, and buyers do not pay their buyer brokers directly, it can be difficult for buyers to appreciate that they are nevertheless sharing with the seller the cost of the buyer broker's services. NAR's Free-Services Rule, which has been widely adopted by NAR-affiliated MLSs, compounds this problem by allowing buyer brokers to mislead buyers into thinking that the buyer broker's services are free when they are not. Under the NAR Code of Ethics, "Unless they are receiving no compensation from any source for their time and service, REALTORS® may use the term 'free' and similar terms in their advertising and in other representations only if they clearly and conspicuously disclose: (1) by whom they are being, or expect to be, paid; (2) the amount of the payment or anticipated payment; (3) any condition

associated with the payment, offered product or service, and; (4) any other terms relating to their compensation." (See NAR Code of Ethics, Standard of Practice 12-1).

21. NAR's Free-Services Rule allows brokers to mislead buyers by obscuring the fact that buyers have a stake in what their buyer brokers are being paid for their services. Buyer broker fees, though nominally paid by the home's seller, are ultimately paid out of the funds from the purchase price of the house. If buyers are told that buyer broker services are "free," buyers are less likely to think to negotiate a lower buyer broker commission or to view buyer broker rebate offers as attractive. In these ways, NAR's Free-Services Rule likely leads to higher prices for services provided by buyer brokers.

### C. NAR'S Commission-Filter Rules and Practices

22. NAR's Commission-Filter Rules and Practices allow buyer brokers to filter MLS listings that will be shown to buyers based on the level of buyer broker commissions offered. Once this filtering is performed, some MLSs further permit buyer brokers to affirmatively choose not to show certain homes to potential home buyers if the buyer broker will make less money because of lower commissions. Homes may be filtered out in this manner even if they otherwise meet the buyer's home search criteria. For example, buyer brokers or agents may use an MLS's software to filter out any listing where a buyer broker will receive less than 2.5% commission on the home sale. The buyer broker would then provide to its home buyer customer only those listings where the buyer broker would be paid a 2.5% commission or more if the home sale is completed.

23. According to Policy Statement 7.58 of NAR's Handbook, for example, "Participants may select the IDX listings they choose to display based only on objective criteria including . . . cooperative compensation offered by listing brokers." Handbook, at 24 (Policy Statement 7.58); see also id. at 43 (VOW Policy) ("A VOW may exclude listings from display

based only on objective criteria, including . . . cooperative compensation offered by listing broker, or whether the listing broker is a Realtor®.").

24. NAR's Commission-Filter Rules and Practices, which have been widely adopted by NAR-affiliated MLSs, facilitates steering by helping buyer brokers conceal from potential home buyers any property listings offering lower buyer broker commissions. As alleged above, the practice of steering buyers away from homes with lower buyer broker commissions likely reduces the quality of buyer broker services and raises prices for buyer broker services, both at the expense of home buyers.

### D. NAR's Lockbox Policy

25. NAR and its members have also adopted a policy and practice that limits access to lockboxes to only those real estate brokers who are members of a NAR-affiliated MLS. Lockboxes hold the keys to a house to allow brokers and potential buyers to access homes for sale, with permission from the selling home owner, while continuing to keep the homes secure. Such lockboxes are accessed by a real estate broker using a numerical code or digital Bluetooth® 'key' enabling the real estate broker to show buyers homes that are listed for sale.

26. NAR and its affiliated MLSs have adopted a series of rules (set forth in the NAR Handbook, Policy Statement 7.31) that limit access to lockboxes only to those real estate brokers that are members of NAR and subscribe to the NAR-affiliated MLS. Licensed, but non-NAR-affiliated brokers are not allowed to access the lockboxes, thereby depriving those brokers the ability to show homes listed for sale. This policy and practice effectively deprives licensed real estate brokers that are not members of NAR from accessing properties for sale to show potential home buyers, thereby lessening competition for buyer broker services.

## VI.     VIOLATION OF SECTION 1 OF THE SHERMAN ACT

27.     NAR's real estate broker members are direct competitors for the provision of listing-broker and buyer broker services. Through the rules, policies, and practices alleged above and challenged in this action, NAR has coordinated and enforced anticompetitive agreements, which have likely contributed to reduced price competition among buyer brokers and a lower quality of buyer broker services for home buyers.

28.     When adopted by NAR Member Boards, the NAR rules, policies, and practices alleged above and challenged in this action are horizontal agreements that govern and enforce the conduct of competing MLS brokers and agents that deny prospective home buyers access to relevant information resulting in higher prices and lower quality for buyer broker services.

29.     The NAR rules, policies, and practices alleged above and challenged in this action have an anticompetitive effect in the relevant markets and unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## VII.     REQUESTED RELIEF

30.     The United States requests that this Court:

(a)     adjudge that the NAR rules, policies, and practices challenged in this action are unreasonable restraints of trade and interstate commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(b)     enjoin and restrain NAR from promulgating, enforcing, or adhering to any rules, policies, or practices that unreasonably restrict competition;

(c)     permanently enjoin and restrain NAR from establishing the same or similar rules, policies, or practices as those challenged in this action in the future, except as prescribed by the Court;

(d) award the United States such other relief as the Court may deem just and proper to redress and prevent recurrence of the alleged violations and to dissipate the anticompetitive effects of the illegal agreements entered into by NAR; and

(e) award the United States the costs of this action.

Respectfully submitted,

COUNSEL FOR PLAINTIFF UNITED STATES

**Dated: November 19, 2020**

/s/ Makan Delrahim
MAKAN DELRAHIM (D.C. Bar #457795)
Assistant Attorney General
Antitrust Division

/s/ Michael F. Murray
MICHAEL F. MURRAY (D.C. Bar #1001680)
Deputy Assistant Attorney General

/s/ Owen M. Kendler
OWEN M. KENDLER
Chief

/s/ Lisa A. Scanlon
LISA A. SCANLON
Assistant Chief
Media, Entertainment, and Professional Services Section
U.S. DOJ, Antitrust Division
450 Fifth St., NW, Suite 4000
Washington, DC 20001
Tel. 202.305.8376
owen.kendler@usdoj.gov
lisa.scanlon@usdoj.gov

/s/ Samer M. Musallam
Samer M. Musallam* (DC Bar # 986077)
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Ave., NW, Suite 3110
Washington, DC 20530
Tel. 202.598.2990
Fax: 202.514.9033
samer.musallam@usdoj.gov

*Attorneys for the United States*

*LEAD ATTORNEY TO BE NOTICED