## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Case No. 1:20-cv-03356-TJK |
| NATIONAL ASSOCIATION OF REALTORS®, | |
| *Defendant*. | |

### COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) ("APPA" or "Tunney Act"), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

### I.       NATURE AND PURPOSE OF THE PROCEEDING

On November 19, 2020, the United States filed a civil antitrust Complaint against Defendant National Association of REALTORS® ("NAR") alleging that a series of rules, policies, and practices promulgated by NAR resulted in a lessening of competition among real estate brokers and agents to the detriment of American home buyers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. [Dkt. No. 1.]

The Complaint alleges that certain NAR rules, policies, and practices have been widely adopted by NAR's members, including the multiple listing services ("MLSs") affiliated with NAR that facilitate the publishing and sharing of information about local homes for sale, resulting in a

lessening of competition among real estate brokers and agents to the detriment of American home buyers. These NAR rules, policies, and practices include those that:

a. prohibit MLSs affiliated with NAR from disclosing to potential home buyers the amount of commission that the buyer's real estate broker or agent will earn if the buyer purchases a home listed on the MLS;

b. allow brokers for home sellers ("buyer brokers") to misrepresent to potential home buyers that a buyer broker's services are free;

c. enable buyer brokers to filter the listings of homes for sale via an MLS based on the level of buyer broker commissions offered and exclude homes with lower commissions from consideration by potential home buyers; and

d. limit access to lockboxes, which provide physical access to homes for sale, only to real estate brokers or agents working with a NAR-affiliated MLS.

At the same time the Complaint was filed, the United States filed a Stipulation and Order and proposed Final Judgment, which are designed to remedy the anticompetitive effects alleged in the Complaint. [Dkt. No. 4.] On November 20, 2020, the Court entered the Stipulation and Order. [Dkt. No. 5.]

Under the proposed Final Judgment, NAR is required to repeal, eliminate, or modify its rules, practices, and policies that the Division alleges in the Complaint violate the Sherman Act. Specifically, NAR and NAR-affiliated MLSs must not (1) adopt, maintain, or enforce any rule, practice, or policy or (2) enter into any agreement or practice that directly or indirectly:

a. prohibits, discourages, or recommends against an MLS or real estate broker or agent working with a NAR-affiliated MLS ("MLS Participant[1] or REALTOR®") publishing or displaying to consumers any MLS data specifying the compensation offered to other MLS Participants, such as buyer brokers;

b. permits or requires MLS Participants, including buyer brokers, to represent or suggest that their services are free or available to a home buyer at no cost to the home buyer;

---

[1] Under the proposed Final Judgment, an "MLS Participant" is defined as "a member or user of, a participant in, or a subscriber to an MLS." (*See* Proposed Final Judgment, Section II – Definitions.)

c.  permits or enables MLS Participants to filter, suppress, hide, or not display or distribute MLS listings based on the level of compensation offered to the buyer broker or the name of the brokerage or brokers or agents; or

d.  prohibits, discourages, or recommends against allowing any licensed real estate broker or agent to access, with approval from the home seller, the lockboxes of properties listed on an MLS.

As discussed in further detail below, the proposed Final Judgment requires NAR to take affirmative steps to remedy the competitive harm alleged in the Complaint. The Stipulation and Order requires NAR to abide by and comply with the provisions of the proposed Final Judgment until the proposed Final Judgment is entered by the Court or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment. [Dkt. No. 5.]

The United States and NAR have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof. [Dkt. No. 4-2.]

## II.  DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.  The Defendant and its Members

Defendant NAR is a trade association organized under the laws of Illinois with its principal place of business in Chicago. NAR is the leading national trade association of real estate brokers and agents. Among NAR's members are licensed residential real estate brokers, including brokers who provide real estate brokerage services to home sellers, home buyers, or both.

Among other activities, NAR establishes and enforces rules, policies, and practices that are then adopted by NAR's more than 1,400 local associations (also known as the "Member Boards") and their affiliated MLSs. These rules, policies, and practices govern the conduct of the

approximately 1.4 million MLS Participants or REALTORS® affiliated with NAR who are engaged in residential real estate brokerages across the United States.

An MLS is a joint venture among competing brokers to facilitate the publishing and sharing of information about homes for sale in a geographic area. The membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area. In each area an MLS serves, the MLS will include or "list" the vast majority of homes that are for sale through a residential real estate broker in that area. In most areas, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings. Listing brokers use the MLS to market sellers' properties to other broker and agent participants in the MLS and, through those other brokers and agents, to potential home buyers. By virtue of nearly industry-wide participation and control over important data, MLSs possess and exercise market power in the markets for the provision of real estate brokerage services to home buyers and sellers in local markets throughout the country.

As alleged in the Complaint, NAR's member brokers and agents compete with one another in local listing broker and buyer service markets to provide real estate brokerage services to home sellers and home buyers. The geographic coverage of the MLS serving an area normally establishes the geographic market in which competition among brokers occurs, although meaningful competition among brokers may also occur in smaller areas, like a particular area of a city, in which case that smaller area may also be a relevant geographic market.

NAR, through its Member Boards, controls a substantial number of the MLSs in the United States. NAR promulgates rules, policies, and practices governing the conduct of NAR-affiliated MLSs that are set forth annually in the *Handbook on Multiple Listing Policy* ("Handbook"). Under the terms of the Handbook, affiliated REALTOR® associations and MLSs "must conform their

governing documents to the mandatory MLS policies established by [NAR's] Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program." (National Association of REALTORS®, Handbook on Multiple Listing Policy 2020 (32nd ed. 2020), at iii).[2]

NAR and its affiliated REALTOR® associations and MLSs enforce the Handbook's rules, policies, and practices as well as the rules, policies, and practices set forth in NAR's Code of Ethics. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership" in NAR. (National Association of REALTORS®, Procedures for Consideration of Alleged Violations of Article IV, Section 2, Bylaws).[3]

## B.    Description of the Challenged Rules, Policies, and Practices and their Anticompetitive Effects

NAR's Handbook and NAR's Code of Ethics impose certain rules, policies, and practices on NAR-affiliated MLSs that affect competition for the provision of buyer broker services among those participating in a given MLS. In addition, some MLSs employ certain practices that are not directly required by a NAR rule or policy, but that similarly affect competition for the provision of buyer broker services among those participating in an MLS.

These rules, policies, and practices, discussed in more detail below, include: prohibiting an MLS from disclosing to potential home buyers the amount of commission that the buyer broker

---

[2] Available at *cdnr.nar.realtor/sites/default/files/document/NAR-HMLP-2020-v2.pdf*. (Last visited on 12/2/2020).
[3] Available at *https://www.nar.realtor/about-nar/governing-documents/code-of-ethics/duty-to-adopt-and-enforce-the-code-of-ethics#:~:text=Any%20Member%20Board%20which%20shall,membership%20in%20the%20National%20Association*. (Last visited on 12/2/2020).

will earn if the buyer purchases a home listed on the MLS ("NAR's Commission Concealment Rules"); allowing buyer brokers to mislead potential home buyers into thinking that buyer broker services are free ("NAR's Free-Service Rule"); enabling buyer brokers to filter MLS listings based on the level of buyer broker commissions offered and to exclude homes with lower commissions from consideration by potential home buyers ("NAR's Commission-Filter Rules and Practices"); and limiting accesses to lockboxes that provide licensed brokers physical access to a home that is for sale to only those real estate brokers who are members of a NAR-affiliated MLS ("NAR's Lockbox Policy").

These rules, policies, and practices constitute agreements that reduce price competition among brokers and lead to lower quality service for American home buyers and sellers.

### 1. *NAR's Commission-Concealment Rules*

NAR's Commission-Concealment Rules recommend that MLSs prohibit disclosing to potential home buyers the total commission offered to buyer brokers. All or nearly all of NAR-affiliated MLSs have adopted a prohibition on disclosing commissions offered to buyer brokers. This means that while buyer brokers can see the commission that is being offered to them if their home buyer purchases a specific property – a commission that will ultimately be paid through the home purchase price that the home buyer, represented by the buyer broker, pays – MLSs conceal this fee from potential home buyers.

NAR's Commission-Concealment Rules lessen competition among buyer brokers by reducing their incentives to compete against each other by offering rebates. These rules also make potential home buyers both less likely and less able to negotiate a rebate off the offered commission. NAR's Commission-Concealment Rules encourage and perpetuate the setting of

persistently high commission offers by sellers and their listing agents. This contributes to higher prices for buyer broker services.

As alleged in the Complaint, NAR's Commission-Concealment Rules can also lead to other anticompetitive effects. Because of the Commission-Concealment Rules, buyer brokers may steer potential home buyers away from properties with low commission offers by filtering out, failing to show, or denigrating homes listed for sale that offer lower commissions than other properties in the area. When potential home buyers can't see commission offers, they can't detect or resist this type of steering. Steering not only results in higher prices for buyer broker services, it also reduces the quality of the services that are rendered to the potential home buyer, making it less likely that the buyer will ultimately be matched with the optimal home choice. Fear of having potential home buyers steered away from a property is a strong deterrent to sellers who would otherwise offer lower buyer broker commissions, which further contributes to higher prices for buyer broker services.

### 2.      *NAR's Free-Service Rule*

Because commissions are offered by home sellers – and home buyers do not pay their buyer brokers directly – it can be difficult for buyers to appreciate that they are nevertheless sharing with the seller the cost of the buyer broker's services. NAR's Free-Service Rule, which has been widely adopted by NAR-affiliated MLSs, compounds this problem by allowing buyer brokers to mislead buyers into thinking the buyer broker's services are free and hide the fact that buyers have a stake in what their buyer brokers are being paid. Under NAR's Code of Ethics, "Unless they are receiving no compensation from any source for their time and service, REALTORS® may use the term 'free' and similar terms in their advertising and in other representations only if they clearly and conspicuously disclose: (1) by whom they are being, or expect to be, paid; (2) the amount of

the payment or anticipated payment; (3) any condition associated with the payment, offered product or service, and; (4) any other terms relating to their compensation." (NAR Code of Ethics, Standard of Practice 12-1.[4])

Buyer broker fees, though nominally paid by the home's seller, are ultimately paid out of the funds from the purchase price of the house. If potential home buyers are told that buyer broker services are "free," buyers are less likely to think to negotiate a lower buyer-broker commission or to view the buyer broker rebate offers as attractive. In these ways, NAR's Fee-Service Rule likely leads to higher prices for services provided by buyer brokers.

### 3.   *NAR's Commission-Filter Rules and Practices*

NAR's Commission-Filter Rules and Practices allow buyer brokers to filter MLS listings that will be shown to potential home buyers based on the level of buyer broker commissions offered. Once this filtering is performed, some MLSs further permit buyer brokers to affirmatively choose not to show certain homes to potential home buyers if the buyer broker will make less money because of lower commissions. Homes may be filtered out in this manner even if they otherwise meet the buyer's home search criteria. For example, buyer brokers or agents may use an MLS's software to filter out any listing where buyer brokers will receive less than 2.5% commission on the home sale. The buyer broker would then provide to his home buyer customer only those listings where the buyer broker would be paid a 2.5% commission or more if the home sale is completed.

According to Policy Statement 7.58 of NAR's Handbook, for example, "[p]articipants may select the IDX listings they choose to display based only on objective criteria

---

[4] Available at *https://www.nar.realtor/about-nar/governing-documents/code-of-ethics/2021-code-of-ethics-standards-of-practice*. (Last visited on 12/2/2020).

including…cooperative compensation offered by listing brokers." (Handbook, at 24, Policy Statement 7.58; *see* NAR's VOW Policy, *id.* at 43 ("A VOW may exclude listings from display based only on objective criteria, including…cooperative compensation offered by the listing broker, or whether the listing broker is a Realtor®."))[5]

NAR's Commission-Filter Rules and Practices, which have been widely adopted by NAR-affiliated MLSs, are anticompetitive because they facilitate steering by helping buyer brokers conceal from potential home buyers any property listings offering lower buyer broker commissions. The practice of steering buyers away from homes with lower buyer broker commissions likely reduces the quality of buyer broker services and raises prices for buyer broker services, both at the expense of buyers.

### 4.     *NAR's Lockbox Policy*

Lockboxes hold the keys to a house to allow brokers and potential home buyers to access homes for sale, with permission from the selling home owner, while continuing to keep the homes secure. Such lockboxes are typically accessed by a real estate broker using a numerical code or digital Bluetooth® "key" enabling the real estate broker to show buyer homes that are listed for sale.

NAR and its affiliated MLSs have adopted a policy and practice that limits access to lockboxes to only those real estate brokers who are members of NAR and subscribe to the NAR-affiliated MLS. (*See* Handbook, Policy Statement 7.31).[6] Licensed, but non-NAR-affiliated brokers are not allowed to access the lockboxes. Because only real estate brokers that are members

---

[5] Available at *cdnr.nar.realtor/sites/default/files/document/NAR-HMLP-2020-v2.pdf*. (Last visited on 12/2/2020).
[6] Available at *cdnr.nar.realtor/sites/default/files/document/NAR-HMLP-2020-v2.pdf*. (Last visited on 12/2/2020).

of NAR and subscribe to the NAR-affiliated MLS are permitted access to lockboxes, this policy and practice effectively deprives licensed real estate brokers that are not members of NAR from accessing properties for sale to show potential home buyers. This lessens competition for buyer broker services as real estate brokers that are not members of NAR cannot access lockboxes and show properties to their clients.

### C.     The Challenged Rules, Policies, and Practices Violate the Antitrust Laws

NAR's challenged rules, policies and practices violate Section 1 of the Sherman Act, 15 U.S.C. §1, which prohibits unreasonable restraints on competition. NAR's real estate broker members are direct competitors for the provision of listing broker and buyer broker services. NAR and its affiliated MLSs have widely adopted the challenged rules, policies, and practices. Adoption by NAR and its affiliated MLSs of these rules, policies, and practices reflects concerted action between horizontal competitors and constitutes agreements among competing real estate brokers that reduce price competition among brokers and lead to higher prices and a lower quality of service for American home buyers. *See, e.g., Realcomp II, Ltd. v. FTC,* 635 F.3d 815, 828-29 (6th Cir. 2011) (holding that association of real-estate brokers was a contract, combination, or conspiracy with respect to allegedly anticompetitive policies).

When adopted by NAR Member Boards, the NAR rules, policies, and practices alleged above and challenged in this action are horizontal agreements that govern and enforce the conduct of competing MLS brokers and agents that deny potential home buyers access to relevant information resulting in higher prices and lower quality for buyer broker services.

The NAR rules, policies, and practices challenged in this action have anticompetitive effects in the relevant market for local listing broker and buyer broker services in the United States

that outweigh any purported pro-competitive benefits. Accordingly, they unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment prohibits NAR and its Member Boards from undertaking certain conduct and affirmatively requires NAR to take certain actions to remedy the antitrust violations alleged in the Complaint.

#### A.    Prohibited and Required Conduct

##### 1.    Commission-Concealment Rules

Paragraph IV.1 of the proposed Final Judgment prohibits NAR and its Member Boards from adopting, maintaining, or enforcing any rule, or from entering into or enforcing any agreement or practice, that directly or indirectly "prohibits, discourages, or recommends against an MLS or MLS Participant publishing or displaying to consumers any MLS data specifying the compensation offered to other MLS Participants."

Paragraphs V.C.-E. of the proposed Final Judgment further require NAR to adopt new rules, the content of which must be approved by the United States, that:

a.    repeal any rule that prohibits, discourages, or recommends against an MLS or MLS Participant publishing or displaying to consumers any MLS data specifying compensation offered to other MLS Participants;

b.    repeal any rule that prohibits, discourages, or recommends against an MLS or MLS Participant publishing or displaying to consumers any MLS data specifying compensation offered to other MLS Participants; or

c.    require all MLS Participants to provide to their clients with information about the amount of compensation offered to other MLS Participants.

These provisions, as set forth in the proposed Final Judgment, are designed to resolve the competitive concerns related to NAR's Commission-Concealment rules as alleged in the Complaint.

### 2.      ***Free-Service Rule***

Paragraph IV.2 of the proposed Final Judgment prohibits NAR and its Member Boards from adopting, maintaining, or enforcing any rule, or from entering into or enforcing any agreement, that directly or indirectly "permits or requires MLS Participants, including buyer Brokers, to represent or suggest that their services are free or available to a Client at no cost to the Client."

Paragraph V.F. of the proposed Final Judgment further requires NAR to adopt new rules, the content of which must be approved by the United States, that:

      a.  repeals any rule that permits all MLSs and MLS Participants, including buyer Brokers, to represent that their services are free or available at no cost to their clients;

      b.  requires all Member Boards and MLSs to repeal any rule that permits MLSs and MLS Participants, including buyer Brokers, to represent that their services are free or available at no cost to their clients; and

      c.  prohibits all MLSs and MLS Participants, including buyer Brokers, from representing that their services are free or available at no cost to their clients.

These provisions, as set forth in the proposed Final Judgment, are designed to resolve the competitive concerns with NAR's Free-Service Rule as alleged in the Complaint.

### 3.      ***Commission-Filter Rules and Practices***

Paragraph IV.3 of the proposed Final Judgment prohibits NAR and its Member Boards from adopting, maintaining, or enforcing any rule, or from entering into or enforcing any agreement that directly or indirectly "permits or enables MLS Participants to filter, suppress, hide, or not display or distribute MLS listings based on the level of compensation offered to the buyer Broker or the name of the brokerage or agent."

Paragraph V.G. of the proposed Final Judgment further requires NAR to adopt new rules, the content of which must be approved by the United States that:

    a.   prohibits MLS Participants from filtering or restricting MLS listings that are searchable by or displayed to consumers based on the level of compensation offered to the buyer Broker or the name of the brokerage or agent; and

    b.   repeals any rule that permits or enables MLS Participants to filter or restrict MLS listings that are searchable by or displayed to consumers based on the level of compensation offered to the buyer Broker, or by the name of the brokerage or agent.

These provisions, as set forth in the proposed Final Judgment, are designed to resolve the competitive concerns with NAR's Commission-Filter Rules and Practices as alleged in the Complaint.

### 4.    *Lockbox Policy*

Paragraph IV.4 of the proposed Final Judgment prohibits NAR and its Member Boards from adopting, maintaining, or enforcing any rule, or from entering into or enforcing any agreement or practice, that directly or indirectly "prohibits, discourages, or recommends against the eligibility of any licensed real estate agent or agent of a Broker, from accessing, with seller approval, he lockboxes of those properties listed on an MLS."

Paragraph V.H. of the proposed Final Judgment further requires NAR to adopt one or more rules, the content of which must be approved by the United States, that "requires all Member Boards and MLSs to allow any licensed real estate agent or agent of a Broker, to access, with seller approval, the lockboxes of those properties listed on an MLS."

These provisions, as set forth in the proposed Final Judgment, are designed to resolve the competitive concerns with NAR's Lockbox Policy as alleged in the Complaint.

### B.    **Other Provisions**

*Notice to Member Boards, MLS Participants and Public.* Paragraph V.I. of the proposed Final Judgment requires NAR to furnish notice of this action to all of its Member Boards and MLS Participants through (1) a communication, in a form to be approved by the United States, that must contain the Final Judgment, the new rules NAR proposes to issue to comply with the proposed

Final Judgment, and this Competitive Impact Statement; and (2) the creation and maintenance of a page on NAR's website, to be posted for no less than one year, that contains links to the Final Judgment, the new rules NAR proposes to issue to comply with the proposed Final Judgment, this Competitive Impact Statement; and the Complaint. Notification to NAR's Member Boards and MLS Participants is required to ensure compliance with the Final Judgment by NAR and its Member Boards and MLS Participants, while publication of this action on NAR's website will provide notice to the public of all prohibited and required conduct.

*Antitrust Compliance Officer.* The proposed Final Judgment also contains provisions designed to promote compliance and make enforcement of the Final Judgment as effective as possible. Paragraph VI requires NAR to appoint an Antitrust Compliance Officer who is responsible for, among other things, annually briefing NAR's management on the meaning and requirements of the Final Judgment and the antitrust laws, providing NAR's management and employees with reasonable notice of the meaning and requirements of the Final Judgment, and obtaining and maintaining certification from all members of NAR's management that they understand and agree to abide by the terms of the Final Judgment. The Antitrust Compliance Officer is also required to (1) annually communicate to NAR's management and employees that they must disclose to the Antitrust Compliance Officer any information concerning any potential violation of the Final Judgment of which they are aware and (2) file a report with the United States describing that NAR has met its obligations under the Final Judgment.

*Enforcement of Final Judgment.* Paragraph IX.A. provides that the United States retains and reserves all rights to enforce the Final Judgment, including the right to seek an order of contempt from the Court. Under the terms of this paragraph, NAR has agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States

regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that NAR has waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance with the Final Judgment with the standard of proof that applies to the underlying offense that the Final Judgment addresses.

Paragraph IX.B. provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. The proposed Final Judgment is intended to remedy the competition the United States alleges was harmed by the challenged conduct. NAR agrees that it will abide by the proposed Final Judgment and that it may be held in contempt of the Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Paragraph IX.C. of the proposed Final Judgment provides that if the Court finds in an enforcement proceeding that NAR has violated the Final Judgment, the United States may apply to the Court for a one-time extension of the Final Judgment, together with such other relief as may be appropriate. In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the Final Judgment, Paragraph IX.C. provides that, in any successful effort by the United States to enforce the Final Judgment against NAR, whether litigated or resolved before litigation, NAR will reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with any effort to enforce the Final Judgment, including the investigation of the potential violation.

Paragraph IX.D. states that the United States may file an action against NAR for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the

Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated. This provision, therefore, makes clear that, for four years after the Final Judgment has expired or been terminated, the United States may still challenge a violation that occurred during the term of the Final Judgment.

   *Expiration of Final Judgment.* Paragraph X of the proposed Final Judgment provides that the Final Judgment will expire seven years from the date of its entry, except that after five years from the date of its entry, the Final Judgment may be terminated upon notice by the United States to the Court and NAR that the continuation of the Final Judgment is no longer necessary or in the public interest.

   *Reservation of Rights.* Paragraph XI of the proposed Final Judgment reserves the rights of the United States to investigate and bring actions to prevent or restrain violations of the antitrust laws concerning any rule, policy, or practice adopted or enforced by NAR or any of its Member Boards and that nothing in the Final Judgment shall limit those rights.

## IV.  REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

   Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment neither impairs nor assists the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against NAR.

## V. PROCEDURES AVAILABLE FOR MODIFICATION
## OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment. The comments and the response of the United States will be filed with the Court. In addition, comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website and, under certain circumstances, published in the *Federal Register*.

Written comments should be submitted to:

> Chief, Media, Entertainment and Professional Services Section
> Antitrust Division
> U.S. Department of Justice
> 450 Fifth Street, NW, Suite 8000
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.       ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the proposed Final Judgment, the United States considered a full trial on the merits against NAR. The United States could have continued the litigation and sought preliminary and permanent injunctions against NAR for the challenged conduct. The United States is satisfied, however, that the prohibited and required conduct described in the proposed Final Judgment will remedy the anticompetitive effects alleged in the Complaint, increasing competition for buyer broker services in the United States. Thus, the proposed Final Judgment is designed to achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII.      STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

> (A)     the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)     the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *United States v. Associated Milk Producers, Inc.*, 534 F.2d 113, 117 (8th Cir. 1976) ("It is axiomatic that the Attorney General must retain considerable discretion in controlling government litigation and in determining what is in the public interest."); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "'make *de novo* determination of facts and issues.'" *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quoting *United States v. Mid-Am. Dairymen, Inc.*, No. 73 CV 681-W-1, 1977 WL 4352, at *9 (W.D. Mo. May 17, 1977)); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16 (D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and

political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at 1577 (quotation marks omitted). "The court should bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (quotation marks omitted); *see also United States v. Deutsche Telekom AG*, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to congressional intent. *Id.* at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." *Id.*; *see also United States v. Mid-Am. Dairymen, Inc.*, No. 73 CV 681-W-1, 1977 WL 4352, at *9 (W.D. Mo. May 17, 1977) ("It was the intention of Congress in enacting [the] APPA to preserve consent decrees as a viable enforcement option in antitrust cases.").

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms.") (internal citations omitted); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A

district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case"); *see also Mid-Am. Dairymen*, 1977 WL 4352, at *9 ("The APPA codifies the case law which established that the Department of Justice has a range of discretion in deciding the terms upon which an antitrust case will be settled"). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting W. Elec. Co*., 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using consent judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in

this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).

## VIII.        DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

**Dated**:  December 10, 2020                    Respectfully submitted,

                                    FOR PLAINTIFF
                                    UNITED STATES OF AMERICA

                                     /s/ Samer M. Musallam
                                    SAMER M. MUSALLAM (DC Bar # 986077)
                                    U.S. Department of Justice
                                    Antitrust Division
                                    950 Pennsylvania Ave., NW, Suite 3110
                                    Washington, DC 20530
                                    Tel: (202) 598-2990
                                    Fax: (202) 514-9033
                                    Email: samer.musallam@usdoj.gov